**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **CALBERT D. C.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:17-CV-3428-C (BH)** |
| | § | |
| **NANCY A. BERRYHILL,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED IN PART**, and the case should be **REMANDED** for further administrative proceedings.

## I.  BACKGROUND

Calbert D. C. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act (Act).  (docs. 1 at 1-2; 16 at 7.)[1]

**A.      Procedural History**

On May 6, 2015, Plaintiff applied for SSI, alleging disability beginning on May 6, 2015. (doc. 13-1 at 13, 71.)  His claim was denied on September 23, 2015, and upon reconsideration on January 7, 2016.  (*Id*. at 88, 96.)   On February 19, 2016, he requested a hearing before an

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Administrative Law Judge (ALJ).  (*Id*. at 99.)  He appeared and testified at a hearing on January 9,

2017.  (*Id*. at 27-61.)  On February 23, 2017, the ALJ issued a decision finding that he was not

disabled and denying his claim for benefits.  (*Id*. at 13-22.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on April 3, 2017.  (*Id*.

at 151-54.)  The Appeals Council denied his request for review on October 19, 2017, making the

ALJ's decision the final decision of the Commissioner.  (*Id*. at 4.)  Plaintiff timely appealed the

Commissioner's decision under 42 U.S.C. § 405(g).  (*See* docs. 1; 16.)

**B.**    **Factual History**

**1.**    **Age, Education, and Work Experience**

Plaintiff was born on November 1, 1969, and was 47 years old at the time of the hearing

before the ALJ. (doc. 13-1 at 21, 31-32.)  He had at least a high school education and could

communicate in English.  (*Id*. at 21.)  He had past relevant work experience as a pharmaceutical

inspector.  (*Id*. at 55.)

**2.**    **Medical Evidence**

On January 15, 2014, Plaintiff saw Brian Weber, P.A., with complaints of a gout flare up in

his left foot that was hurting him.  (*Id*. at 278.)  His blood pressure was 148/72, and he was assessed

with gout.  (*Id*. at 278-79.)  On January 27, 2014, he returned to Mr. Weber complaining of intense

pain in his right leg that had been hurting for the previous 3 days and prevented him from sleeping.

(*Id*. at 276.)  His blood pressure was 158/108.  (*Id*.)

On May 20, 2014, Plaintiff saw Mr. Weber complaining of a headache behind his eye and

ear on the right side that woke him up on May 18, and lasted all day.  (*Id*. at 273.)  He thought his

blood pressure was up but could not check it, and his headache was gone the following day, but he

had experienced pain in his left shoulder to the extent that he could hardly raise his arm, and it was very sore. (*Id*.) His blood pressure was 138/88. (*Id*.) He was well-developed, well-nourished, and in no acute distress. (*Id*. at 274.) His appearance was normal, attitude was not abnormal, mood was euthymic, thought processes were not impaired, and thought content was not impaired. (*Id*.) He was assessed with rotator cuff tendinitis and a migraine headache. (*Id*.)

On October 29, 2014, Plaintiff saw Mr. Weber with complaints of pain in his right leg following his lower limb amputation. (*Id*. at 266, 269-70.) His blood pressure was 142/90, and he was assessed with phantom limb syndrome with pain. (*Id*.)

On December 3, 2014, January 6, 2015, March 2, 2015, May 4, 2015, August 11, 2015, and November 11, 2015, Plaintiff went to Mr. Weber for refills on his medication. (*Id*. at 258, 262, 264, 266, 316, 321.) In December, he had chronic pain in his right leg, which he described as severe aching pain. (*Id*. at 266.) Plaintiff noticed that when he grabbed certain places on his leg, it reduced the pain. (*Id*.) He could clean himself, bathe, and wipe after using the restroom, but it would trigger the pain in his leg. (*Id*.) His blood pressure was 148/90, and he was well-developed, well-nourished, and oriented to time, person, and place. (*Id*. at 267.) He was assessed with phantom leg syndrome. (*Id*.) In January, Plaintiff reported nasal passage blockage for the previous 3 weeks. (*Id*. at 264.) His blood pressure was 156/100. (*Id*.) He was assessed with allergic rhinitis and phantom limb syndrome. (*Id*. at 265.) In March, it was noted that he was having "more flares in [his] shoulders and elbows." (*Id*. at 262.) His blood pressure was 164/102. (*Id*.) He was well-developed, well-nourished, and in no acute distress, and he was assessed with gout. (*Id*. at 263.) Plaintiff's blood pressure was 168/100 in May. (*Id*. at 258.) In August, he was doing well but had elevated blood pressure, which could be due to his lack of sleep the previous night. (*Id*. at 321.) His

3

blood pressure was 190/110, and he was well-developed, well-nourished, and in no acute distress. (*Id*. at 321-22.) He was assessed with benign essential hypertension. (*Id*. at 322.) In November, he was doing well but still had episodes of burning pain in the stump of his amputated leg. (*Id*. at 316.) His blood pressure was 148/92, and he was well-developed, well-nourished, and in no acute distress. (*Id*. at 317.) He was again assessed with phantom leg syndrome. (*Id*.)

On February 11, 2015, Mr. Weber completed a physical residual functional capacity (RFC) questionnaire for Plaintiff. (*Id*. at 283-85.) He opined that Plaintiff could sit for 6 hours in an 8-hour workday, stand and/or walk for 2 hours in an 8-hour workday, sit for 15 minutes at a time without needing to change position, and stand for 5 minutes at a time without needing to change position due to pain in his right leg. (*Id*. at 283.) He also opined that Plaintiff needed to alternate between sitting and standing, that forcing him to alternate between sitting and standing in one area would not adequately accommodate his pain, and that he would need to "walk it off" for about 5-10 minutes before returning to his previous activity. (*Id*. at 283-84.) Next, he opined that Plaintiff could continuously lift and carry 10 pounds, frequently lift and carry 11-20 and 21-50 pounds, and occasionally carry 51 pounds or more due to his prosthetic limb and phantom pain. (*Id*. at 284.) Lastly, he found that Plaintiff could never reach, handle objects, or finger; that his pain was severe; that he would be off task due to pain and other symptoms 15 minutes per hour, but not consistently; that he would occasionally need unscheduled rest breaks; that he would miss work 2-3 days per month due to exacerbations of pain and/or symptoms; and that his allegations of pain and other symptoms were reasonably consistent with the medical findings. (*Id*. at 284-85.)

On March 16, 2015, Plaintiff went to Mr. Weber in order to get his nose checked to make sure it was healing properly after he had hit it the previous week. (*Id*. at 260.) His blood pressure

was 136/90. (*Id*.) On May 1, 2015, Mr. Weber wrote in a letter that Plaintiff had an above the right knee amputation and occasional phantom limb syndrome but was otherwise very healthy. (*Id*. at 287.) Throughout his treatments with Mr. Weber, his noted active problems included hypertension, right leg lower limb amputation above the knee, and phantom limb syndrome with pain. (*Id*. at 258, 260, 262, 264, 266, 270, 272-73, 276, 278.)

On September 12, 2015, Robert Newberry, M.D., completed a medical report based on his examination of Plaintiff. (*Id*. at 291-97.) Plaintiff alleged disability due to gout, hypertension, and right leg amputation. (*Id*. at 291.) He reported a 2-year history of gout and hypertension, both of which affected his ability to work. (*Id*.) He was not taking medication for gout, but medication "somewhat manage[d] his blood pressure." (*Id*.) His primary symptom of hypertension was headaches 2-3 times per week, which affected his ability to concentrate on work-related activities. (*Id*.) Plaintiff reported an amputation of the right leg above the knee in 1991 due to injuries from a motorcycle accident. (*Id*.) His primary symptom was chronic sharp, dull, aching, and throbbing stump pain that was at an 8 on the pain scale most days, including the date of the examination. (*Id*.) He had some improvement with pain medication and physical therapy. (*Id*.) He had been using a prosthesis for 4-5 years, and used crutches and a cane on occasion. (*Id*.) His amputation affected his ability to work secondary to difficulty with squatting, bending, lifting, and standing or walking for prolonged periods of time. (*Id*.) Plaintiff's typical daily activities consisted of doing things around the house. (*Id*. at 292.) He reported functional limitations of sitting 20 minutes, standing 15 minutes, walking short periods of time, and lifting and carrying 5 pounds occasionally secondary to chronic pain. (*Id*.) His blood pressure was 158/103, and his heart rate was 72. (*Id*.)

A physical examination showed no thyromegaly, thyroid nodule, lymphadenopathy, or mass,

and no clubbing, cyanosis, or edema.  (*Id*. at 293.)  Plaintiff was alert and had good eye contact,
fluent speech, appropriate mood, clear thought processes, normal memory, good concentration, and
he was oriented to time, place, person, and situation.  (*Id*.)  He had an asymmetric, antalgic, and
limping gait, and he did not present to Dr. Newberry with an assistive device other than his metallic
prosthesis.  (*Id*.)  He had 5/5 muscle strength in all extremities tested, and a straight leg raising test
was negative.  (*Id*. at 294.)  He had no joint swelling, erythema, effusion, tenderness, or deformity.
(*Id*.)  He was able to lift, carry, and handle light objects and rise from a sitting position without
assistance, but had some difficulty getting up and down from the exam table, and he was unable to
walk on heels or toes, tandem walk, or stand or hop on either foot bilaterally.  (*Id*.)  He could also
dress and undress adequately well, was cooperative, and gave good effort during the examination.
(*Id*. at 294-95.)  Dr. Newberry diagnosed Plaintiff with right leg amputation, right kidney removal,
gouty arthritis, and hypertension.  (*Id*. at 296.)

   Dr. Newberry opined that Plaintiff could be expected to sit normally in an 8-hour workday
with normal breaks, and that he had moderate limitations with standing and walking due to his right
leg above the knee amputation.  (*Id*.)  He found that Plaintiff did not need an assistive device with
regard to short and long distances and uneven terrain, and that he had moderate limitations with
lifting and carrying due to his amputation.  (*Id*.)  He also opined that Plaintiff had limitations on
bending, stooping, crouching, and squatting, and that he could not perform these activities secondary
to his amputation.  (*Id*. at 296-97.)  He found no manipulative limitations on reaching, handling,
feeling, grasping, or fingering, and opined that Plaintiff could perform those frequently.  (*Id*. at 297.)
There were also some relevant visual limitations due to decreased visual acuity, but no relevant
communicative or workplace environmental limitations.  (*Id*.)

On September 14, 2015, Tamara Williams, RN, APRN, FNP-BC, determined that Plaintiff had allergic rhinitis and phantom leg syndrome with pain. (*Id*. at 305.) She prescribed Allopurinol, Atenolol, Ibuprofen, Gabapentin, and Hydrocodone-Acetaminophen. (*Id*.) That same day, Plaintiff also requested an allergy shot due to nasal drainage, watery eyes, and sneezing. (*Id*. at 318.) He was not feeling poorly, had no vision problems, no cough, and no dizziness or fainting. (*Id*. at 319.) His blood pressure was 158/98, and he was well-developed and in no acute distress. (*Id*.)

On November 30, 2015 and January 7, 2016, Plaintiff again met with Mr. Weber. (*Id*. at 314, 350.) In November, Plaintiff complained that he had dropped a container on his left big toe. (*Id*. at 314.) Mr. Weber noted that he had been compliant with his medications, and his blood pressure was 158/92 at the first appointment. (*Id*. at 314-15.) He was well-developed, well-nourished, and in no acute distress. (*Id*. at 315.) In January, he complained that his body had been "real sore". (*Id*. at 350.) His blood pressure was 160/98 at the second appointment. (*Id*. at 351.)

On February 16, 2016, Plaintiff again met with Nurse Williams and complained of "getting up at night to urinate a lot" and also stated that he felt a little bloated. (*Id*. at 343.) He was diagnosed with a urinary tract infection and phantom leg syndrome with pain. (*Id*. at 345, 347.) On March 10, 2016, Plaintiff told Nurse Williams he was feeling bloated and had noticed a large amount of bright red blood with his bowel movement. (*Id*. at 339.) He had been taking Tums the previous 2 weeks, and he had been constipated for months. (*Id*.) He also requested a refill on his medication. (*Id*.) Nurse Williams diagnosed him with hypertension, constipation, recurrent and persistent hematuria, and phantom leg syndrome with pain. (*Id*. at 337, 341.)

On March 21, 2016, Plaintiff went to Mr. Weber because his blood pressure had been elevated over the weekend. (*Id*. at 333.) He woke up with a headache and his leg was hurting as

well. (*Id.*) He had been compliant with his medications, and his blood pressure was 180/106. (*Id.* at 333-34.) He was assessed with benign essential hypertension. (*Id.* at 334, 336.)

On April 19, 2016, Plaintiff met with Mr. Weber, complaining that his right arm was sore from gout and requesting refills on his medications. (*Id.* at 381.) His blood pressure was 156/102, and he was assessed with calcific tendinitis of his upper arm. (*Id.* at 382.)

On April 27, 2016, Plaintiff went to the Hunt Regional Emergency Medical Center for severe sharp pain in his amputated leg. (*Id.* at 354.) He had no redness or swelling, and no difficulty walking. (*Id.*) He was alert, oriented times 3, and in no acute distress. (*Id.* at 355.) He was diagnosed with phantom limb pain and discharged. (*Id.*) On July 6, Plaintiff complained of an injury to his left shoulder after he was involved in a motor vehicle accident. (*Id.* at 358.) He complained of moderate pain, and denied any injury to the head or neck. (*Id.*) He was alert, oriented times 3, and in no acute distress. (*Id.*) His condition was good and stable. (*Id.* at 359.) He was diagnosed with a muscle strain of the left trapezius and deltoid at the shoulder. (*Id.*)

On July 8, 2016 and July 18, 2016, Plaintiff met with Mr. Weber due to left shoulder pain from his prior motor vehicle accident. (*Id.* at 373, 376.) He initially stated that his left shoulder hurt all over with pulsating and throbbing pain from his back and neck to his elbow, and it was worse when he tried to sleep. (*Id.* at 376.) He was compliant with his medications and his blood pressure was 148/100 at both appointments. (*Id.* at 373-74, 376-77.) He was assessed with muscle spasms at his first appointment and rotator cuff tendinitis at his second appointment. (*Id.* at 374, 377.)

On August 17, 2016 and October 12, 2016, Plaintiff saw Mr. Weber for medication refills. (*Id.* at 368, 370.) At his first appointment, he reported that the last few weeks had been bad due to weather changes, and that he was up every few hours at night due to night terrors and sleep walking.

8

(*Id*. at 368.)  He was assessed with phantom limb syndrome with pain.  (*Id*. at 369.)  In October, he reported that his shoulder was better, and he was well-developed, well-nourished, and in no acute distress.  (*Id*. at 370-71.)

### 3.    Hearing Testimony

On January 9, 2017, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (*Id*. at 27-61.)  Plaintiff was represented by an attorney.  (*Id*. at 27-29.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he was born on November 1, 1969, and that he was right-handed, 5'10", and 207 pounds.  (*Id*. at 32.)  He had completed high school and some college.  (*Id*. at 34.)  He stopped going to school because he could not work and attend school at the same time.  (*Id*. at 34-35.)  He was not married and had three children, and two of the children lived with him.  (*Id*. at 32-33.)  He had been receiving food stamps since June 2016, and he was planning to reapply.  (*Id*. at 33.)  He had a driver's license, but he did not really drive a lot because it hurt.  (*Id*. at 33-34.)  He drove to the hearing that day.  (*Id*. at 34.)

Plaintiff stated that during 2001-2002, he worked for a pharmaceutical company as a production worker and quality control technician.  (*Id*. at 36.)  He walked a lot when he was working because he conducted a lot of inspections.  (*Id*.)  He took some time off from that job and then began working full-time as a car salesman for about 2 months.  (*Id*. at 36-37.)  In 2012 or 2013, he started a recycling business that continued on and off.  (*Id*. at 37.)  His recycling business consisted of gathering cardboard from different locations and selling it as scrap.  (*Id*.)  He stated that he may have made about $7,000 in the previous year before gas expenses.  (*Id*. at 37-38.)  He had not put much time into it the previous year, and only worked about 8 hours per week.  (*Id*. at 38.)  His business

was never profitable. (*Id*. at 38-39.) Sometimes he worked more than 8 hours per week depending on his pain. (*Id*. at 39.)

Plaintiff was in a motorcycle accident in 1989 that caused him to lose his leg. (*Id*. at 39-40.) He also broke his pelvis, lower back, and hip, and had to have a kidney removed. (*Id*. at 40.) He was in and out of the hospital for 3 or 4 years. (*Id*.) He returned to school and work once he recovered. (*Id*.) He used a prosthetic leg, but it was broken at the time of the hearing. (*Id*.) The prosthetic worked for him off and on, but prosthetics only provided really good usage during the first 2 or 3 months before he started having problems. (*Id*. at 40-41.) He was using crutches on the day of the hearing, and stated that he used crutches almost daily. (*Id*. at 41.) The stump where his leg was amputated caused him severe chronic pain, and living with the pain was not easy. (*Id*.) He also had pain in his other leg that had started about 5 years before, as well as issues with gout. (*Id*. at 42.) He felt a lot of pain in the bottom of his foot and could hardly walk, which caused him to use crutches all of the time. (*Id*.) His gout was really bad, and he had gout and arthritis issues throughout his whole body. (*Id*.) On a normal day, his pain was a 7 out of 10, and at its worst, his pain was "way over 10." (*Id*.) On days where his pain was over 10, he tried not to over-medicate himself and went to the hospital at times for treatment. (*Id*. at 42-43.) The worst points of pain were in the stump of his right leg, and sometimes in both of his arms. (*Id*. at 43.) The pain would not allow him to sleep, but none of his other pain compared to that in his stump. (*Id*.) There were regularly days where he would not get out of bed at all. (*Id*.) He estimated it was about once per week, but sometimes it happened more and sometimes less. (*Id*.) When he was at his worst, he would not even watch television because all he wanted to do was stop the pain. (*Id*. at 43-44.)

Doctors had not really been able to help him, and he wanted to change doctors but could not

afford to.  (*Id*. at 44.)  He had not been able to see any specialists.  (*Id*.)  He was also having emotional problems from dealing with the pain.  (*Id*. at 45.)  At times it was hurting so bad that he did not know if he wanted "to be here or not".  (*Id*. at 46.)  On a good day, he could walk around the house and do what he needed to do, but he was unable to walk down the block for exercise.  (*Id*.) He could walk maybe 50 feet before his back started hurting due to his severe limp.  (*Id*.)  Although walking for exercise was not possible, he would go to Walmart to get what he needed and then leave.  (*Id*.)  On a bad day, he was either laid up in bed, or he tried to use a tub of hot water or heating pads to try to get some relief.  (*Id*.)  It took about 12–24 hours for the pain medication to start easing his pain.  (*Id*. at 46-47.)

Plaintiff also recently had a car accident where he hit a horse with his truck, causing him to hurt his left shoulder.  (*Id*. at 47.)  In addition to his gout and arthritis issues, the accident caused his pain to worsen.  (*Id*.)  The injury affected the use of his left shoulder, but the gout affected both of his arms.  (*Id*.)  If he had a sit-down type job, he would not be able to reliably work 8 hours per day for 5 days a week due to his pain.  (*Id*. at 48.)  He also stated that he would not be able to stay focused even if the work was simple because he could not work when he was hurting.  (*Id*.)

Plaintiff could walk for a few minutes before he had to sit down and rest.  (*Id*. at 48-49.)  He could not hold himself up, and he could not hold his phone for long periods of time.  (*Id*. at 49.)  It hurt him to even try to run a comb through his son's hair.  (*Id*. at 50.)  His medication worked some days.  (*Id*.)  He could not lift a car battery, and it hurt for him to pick up boxes.  (*Id*.)  He could not bend straight over to pick up things, it hurt his back and shoulder to reach straight out in front to pick something up, and he also had difficulty reaching overhead.  (*Id*. at 51.)  Some days he could not even move his arm, and he was not always able to pick up his 3-year-old son.  (*Id*.)  He slept

about 4 hours per night on a good night.  (*Id*.)  He often laid down during the day and tried to get as much rest as possible.  (*Id*. at 52.)

       ***b.***      ***VE's testimony***

The VE testified that Plaintiff had past work experience as a pharmaceutical inspector, DOT 559.387-014 (SVP 4, light).  (*Id*. at 55.)

The ALJ asked the VE to consider a hypothetical individual of the same age, education, and work history as Plaintiff that could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit for 6 hours; stand and walk for a combined 2 hours (1 hour sitting and 1 hour walking); alternate positions at 15 minute intervals for standing and walking; occasionally use left foot controls; never use right foot controls; occasionally use right and left hand controls; occasionally reach in all directions with both the left and right; occasionally handle, finger, and feel with the right and left; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; never balance, stoop, kneel, crouch, or crawl; never have exposure to unprotected heights, extreme cold, extreme heat, or vibration; and occasionally operate a motor vehicle. (*Id*. at 55-56.) He would also be off task 10 percent of the time in an 8-hour workday in addition to normal breaks, and absent from work 1 day per month. (*Id*. at 56.) The ALJ asked if the hypothetical individual could perform Plaintiff's past work.  (*Id*.)  The VE responded that he could not.  (*Id*.)  The ALJ then asked if the hypothetical individual would be able to perform any other work.  (*Id*.)  The VE stated that the individual could perform other work only as a call out operator, DOT 237.367-014 (SVP 2, sedentary), with about 1,000 jobs in Texas and 7,400 jobs nationally, and a surveillance system monitor, DOT 379.367-010 (SVP 2, sedentary), with about 350 jobs in Texas and about 5,300 jobs nationally.  (*Id*. at 57.)  The VE noted that the surveillance system monitor job numbers were "very

limited," that those two jobs would be the only matches for the hypothetical individual, and that being off task 10 percent of the time during an 8-hour workday "would be a problem in maintaining competitive employment." (*Id.*) The VE stated that his testimony was consistent with the DOT. (*Id.*)

Plaintiff's attorney then asked the VE if the hypothetical individual being off task 10 percent of the time would impact the two other jobs more than normal. (*Id.* at 58.) The VE responded that being off task 10 percent or more added up to 6 minutes or more per hour, and that most employers would consider that to be excessive off-task time if that were a chronic situation. (*Id.*) The VE also stated that it would ultimately add up to the equivalent of 2 absences per month, which would create another issue. (*Id.*)

The ALJ then asked the VE to consider whether the same hypothetical individual, but who would be off task 15 percent of the time during an 8-hour workday, could perform any of the past work that was described. (*Id.* at 58-59.) The VE responded that he could not because the off task time would be considered excessive by the employer. (*Id.*) The ALJ also asked if the individual could perform any other work with this additional limitation, and the VE responded that he could not for the same reason. (*Id.*) The ALJ asked if this portion of the VE's testimony was consistent with the DOT. (*Id.*) The VE responded that off task time was not addressed in the DOT, but he relied on 3 other sources for this area of his testimony: review of the literature in his profession as a member of the American Board of Vocational Experts, contact with employers, and his 30 years of work experience. (*Id.* at 59-60.)

C.    **ALJ's Findings**

The ALJ issued his decision denying benefits on February 23, 2017. (*Id.* at 13-22.) At step

one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 6, 2015, the application date. (*Id*. at 15.) At step two, the ALJ found that he had the following severe impairments: gouty arthritis, left foot pain, hypertension with headaches, status post-right above-the-knee leg amputation, and phantom pain syndrome. (*Id*.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id*.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 416.967(b). (*Id*. at 16-17.) Specifically, the ALJ found that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand for 1 hour with the need to alternate sitting for 15 minutes after every 15 minutes of walking; sit for 6 hours in an 8-hour workday; push or pull commensurate with lifting restrictions; never balance, stoop, kneel, crouch, crawl, or climb ladders, ropes, or scaffolds; never operate foot controls with his left foot or operate hand controls with his bilateral hands; only occasionally reach, handle, finger, and feel; never be exposed to unprotected heights or extreme heat or cold; never have concentrated exposure to vibrations; and occasionally operate motor vehicles. (*Id*. at 16-17.) He further found that Plaintiff could be expected to be off task 10 percent of the time in an 8-hour workday in addition to normal breaks, and that he would be absent from the workplace 1 day per month. (*Id*. at 17.)

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (*Id*. at 21.) At step five, the ALJ found that transferability of job skills was not an issue because the Medical Vocational Rules supported a finding that Plaintiff was not disabled whether or not he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform, including

14

jobs as a call out operator and surveillance system monitor. (*Id.* at 21-22.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, since May 6, 2015. (R. at 80.)

## II. LEGAL STANDARDS

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id.* Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies

16

his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.    At step five of the sequential analysis, the burden of proof shifts to the Commissioner to show the claimant is not disabled by virtue of his ability to perform other work. The ALJ in this case found that Plaintiff would be off task ten percent of the time but could nevertheless work as a "surveillance system monitor" and "call out operator." Did the ALJ carry the burden of proof when the vocational expert testified that Plaintiff would be unlikely to hold these jobs on a competitive basis?

2.    At step five, Commissioner must also demonstrate that the disability claimant can perform other work that exists in "significant numbers." Assuming the ALJ was correct to find that [Plaintiff] could work as a surveillance systems monitor and call out operator, was the ALJ correct to find that this work existed in significant numbers when the vocational expert only identified 12,700 jobs in the nation and considered the incidence of work "very limited"?

(doc. 16 at 6.)

### A.    <u>Ability to Perform Other Work</u>

Plaintiff argues that the ALJ erred because the VE testified that he "would be unable to hold a job if he had the work-related limitations the ALJ identified." (*Id*. at 11.)

To be considered disabled, a claimant must have a severe impairment that makes him unable

17

to perform his previous work or any other substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a). According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with [his] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy. 20 C.F.R. § 404.1520(a)(4)(I); *Greenspan*, 38 F.3d at 236. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

When determining that a claimant can perform other work, the ALJ may rely on the Medical–Vocational Guidelines or, if limitations make the Medical–Vocational Guidelines inapplicable, the ALJ must rely upon the testimony of a VE or other similar evidence. *Carey v. Apfel*, 730 F.3d 131, 145 (5th Cir. 2000). A VE relies on the Dictionary of Occupational Titles ("DOT") in order to testify regarding skills needed and availability of specific jobs. However, the DOT "is not comprehensive, in that it cannot and does not purport to include each and every specific skill or qualification for a particular job." *Id*. "[A]ll kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation." *Id*. at 146. Therefore, the VE must interpret the DOT and make adjustments to fit a particular claimant. Accordingly, the ALJ must rely upon the VE to make adjustments to the availability of jobs based on a particular claimant's skills and abilities.

Here, the ALJ asked the VE if a hypothetical individual with Plaintiff's RFC could perform

other work in the national economy.  (doc. 13-1 at 56.)  The VE responded that the hypothetical

individual could perform other work as a call out operator and surveillance system monitor, but

specifically noted that those were the only job matches, and that being off task for 10 percent of the

time during an 8-hour workday "would be a problem in maintaining competitive employment." (*Id*.

at 57.)  Plaintiff's attorney then asked if being off task 10 percent of the time would impact those

two jobs.  (*Id*. at 58.)  The VE responded that most employers would consider it to be excessive off

task time if it were a chronic situation, and noted that it would ultimately add up to the equivalent

of 2 absences per month, which would create another issue.  (*Id*.)  The ALJ relied on the VE's

testimony in determining that Plaintiff could perform work that existed in significant numbers in the

national economy as a call out operator and surveillance system monitor.  (*Id*. at 22.)

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because

he ignored the VE's testimony that being off task 10 percent of the time would be a problem in

maintaining competitive employment without any explanation.  (doc. 16 at 11-13.)  Courts have

recognized that when an ALJ elicits testimony from a VE, the ALJ cannot ignore the VE's testimony

without explanation. *See Avalos v. Colvin*, No. EP-14-CV-97-ATB, 2016 WL 1583677, at *5 (W.D.

Tex. Apr. 19, 2016) (citing cases); *Elders v. Apfel*, No. 3-98-CV-1602-BD, 1999 WL 61398, at *6

n.2 (N.D. Tex. Jan. 28, 1999) (noting that the ALJ could not ignore the VE's testimony that the

plaintiff could not perform past work or other work after eliciting testimony on the issue); *see also*

*Rodriguez v. Barnhart*, No. Civ.A. SA01CA1101FB(N), 2003 WL 1956230, at *9 (W.D. Tex. Mar.

21, 2003) (finding that the ALJ erred in failing to discuss the VE's testimony that the plaintiff would

have problems performing other work after the plaintiff's attorney cast doubt on the "plaintiff's

ability to maintain employment and properly perform in those jobs.").  Although the ALJ relied on

19

the VE's testimony in determining that Plaintiff could perform other work, he did not discuss the VE's testimony that being off task 10 percent of the time would be a problem in maintaining competitive employment, or explain why he did not discuss that portion of the VE's testimony. (*See* doc. 13-1 at 21-22.)

The Commissioner argues that the ALJ properly relied on the VE's testimony because the VE did not testify that the other jobs identified would be impossible given Plaintiff's RFC limitations. (doc. 17 at 8.) Even though the VE did not testify that such jobs would be impossible, he specifically commented that it would be a problem in maintaining competitive employment for an individual to be off task 10 percent of the time. (doc. 13-1 at 57.) Without explanation, it is unclear why the ALJ did not consider that portion of the VE's testimony in determining that Plaintiff could perform other work, and his "decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Having elicited testimony from the VE regarding Plaintiff's ability to perform other work and including the limitation to be off task 10 percent of the time in Plaintiff's RFC, the ALJ could not ignore the VE's testimony that it would be problematic for Plaintiff to maintain competitive employment if he were off task 10 percent of the time without explanation. *See Avalos*, 2016 WL 1583677, at *5 (citing cases) (stating "that when the ALJ elicits testimony from a VE, the use of the VE cannot be ignored and must be proper under the law."); *Elders*, 1999 WL 61398, at *6 (noting that the ALJ failed to provide any "explanation or rationale for ignoring" the VE's testimony that the plaintiff could not perform other work).

Because the ALJ relied on the VE's testimony but did not explain why he did not consider the VE's statements that Plaintiff would have difficulty maintaining competitive employment if he

20

were off task 10 percent of the time in making his step five determination, his decision was not based on substantial evidence. *Elders*, 1999 WL 61398, at *6 (finding that the ALJ's decision was not supported by substantial evidence, in part, because it provided no explanation for ignoring the VE's testimony); *see also AMP v. United States Comm'r Soc. Sec. Admin.*, No. 12-CV-0916, 2013 WL 3779203, at *1 (W.D. La. July 17, 2013) (finding that the ALJ's step five determination was not supported by substantial evidence where the ALJ concluded that the plaintiff could perform other work even though the VE testified that an individual with the plaintiff's RFC could not perform other work).

## B.    Harmless Error

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected."  *Mays v. Bowen*, 837 F.2d 1362, 1363–64 (5th Cir. 1988).  "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).  Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the ALJ's consideration of the VE's testimony regarding Plaintiff's ability to maintain competitive employment with the limitations set forth in the RFC could have resulted in a different decision. *See Nash v. Berryhill*, No. 3:17-CV-00562-C (BH), 2018 WL 1940315, at *13–14 (N.D. Tex. Apr. 2, 2018) (applying a harmless-error standard when the ALJ erred in determining the plaintiff's ability to perform work).

21

Here, the ALJ determined that Plaintiff could work as a call out operator and surveillance system monitor based on the VE's testimony.  (doc. 13-1 at 22.)  As discussed, there was a lack of substantial evidence to determine that Plaintiff could perform these jobs because the VE specifically stated that being off task 10 percent of the time during an 8-hour workday "would be a problem in maintaining competitive employment."  (*Id*. at 57.)  Plaintiff was prejudiced by the ALJ's reliance on the VE's testimony in finding that he could perform other work without discussing or explaining why he disregarded the VE's testimony that it would be difficult to maintain competitive employment; if he had considered that testimony, it is possible that he might have determined that Plaintiff could not perform other work.  As noted above, without explanation it is unclear why the ALJ did not consider this portion of the VE's testimony or what affect its consideration would have had on the decision.  It is possible that consideration of the VE's testimony would have caused the ALJ to make a different determination regarding Plaintiff's ability to perform other work that existed in significant numbers in the national economy.  The ultimate determination, however, will be made on remand.  Accordingly, Plaintiff has demonstrated that he was prejudiced and that a substantial right has been affected.  The error is therefore not harmless, and remand is warranted.[2]

## IV.  RECOMMENDATION

The final decision of the Commissioner should be **REVERSED in part**, and the case should be **REMANDED** to the Commissioner for further proceedings.

_____

[2] Because this error requires remand, and full consideration of the VE's testimony may affect the remaining issue, it is unnecessary to reach that issue.

**SO RECOMMENDED**, on this 25th day of February, 2019.

*Irma Carrillo Ramirez*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

*Irma Carrillo Ramirez*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE